MAX N. TOBIAS, JR., Judge.
| ,This case arises out of a dispute over the operation of a charter fishing business at Breton Island, Louisiana. Dennis Good and C.I. Charters, Inc. appeal from a judgment entered against them by the trial court on 10 January 2001, in the total amount of $28,909.99. For the following reasons, we amend the judgment to correct a mathematical error by the trial court and affirm the judgment as amended.
Plaintiff, Larry Arcement (“Mr.Arcement”), met Mr. Good in March 1994 and began discussions about a charter fishing enterprise that Mr. Good was operating at Breton Island. The vessel Chandeleur Islander had been at Breton Island for two previous years and was used by Mr. Good for the enterprise.[1] Mr. Good was interested in securing a more reliable taxiing service between Venice, Louisiana and Breton Island and in turning the chartering business over to a separate company. First, on 14 April 1994, C.I. Charters, Inc. (hereinafter “CIC”) was incorporated by Steven Quantz, for the sole purpose of managing the Chandeleur Islander, whereby Mr. Quantz was the owner and sole shareholder of |¡>CIC; Mr. Good agreed to be its employee to assist Mr. Quantz with day-to-day operations of the charter fishing boat business.
Second, Mr. Good contacted Mr. Arcement to negotiate a boat taxiing service. Mr. Arcement expressed an interest in getting himself and his family involved in the houseboat charter business. Mr. Arcement suggested that his corporation, Arcement Boat Rentals, Inc. (hereinafter “ABRI”), purchase a houseboat and rent it to CIC for $350.00 per day under a bare-boat rental agreement. Mr. Arcement began his investigation. He discovered that, before lending money for the vessel, the bank wanted proof that ABRI would have steady income.
On 15 April 1994, Mr. Good wrote a letter as President of Chandeleur Islander Resort/Good Streak, which stated that he was currently negotiating a rental agreement with ABRI. The letter was on Chan-deleur Islander Resort/Good Streak letterhead and signed by Mr. Good as president. The loan to ABRI was completed and the houseboat was purchased and docked beside the Chandeleur Islander at Breton Island.
In late April or early May 1994, Messrs. Good and Arcement decided that a bare-boat rental would not be economically feasible; instead, the men agreed to form a joint venture whereby Mr. Good would receive two-thirds of the profits and Mr. Arcement would receive one-third of the profits of the venture.[2] They also agreed that the expenses would be split similarly, with each party responsible for |3the maintenance of its respective houseboat. The joint venture began on or about 10 May 1994 and terminated on 17 July 1994. Although a written agreement was later prepared by Mr. Good and presented to Mr. Arcement for review and signature, the agreement was never signed. The pro *617 posed written agreement contemplated a joint venture between CIC and ABRI.
Initially, the checking account of Good Streak was used to funnel money to and from the joint venture. The CIC account was opened on 5 June 1994, and after that date, the CIC account was used to handle most of the venture’s business.
The primary dispute between the litigants involves in what capacity the parties agreed to enter into the joint venture. Mr. Good contends that at all times, he was negotiating on behalf of CIC, as reflected in the proposed written joint venture agreement. On the other hand, Mr. Arcement’s position is that he was negotiating with Mr. Good personally; it was only after the venture was operating when Mr. Good used a checkbook of CIC that Mr. Arcement became aware of the corporation.
The venture terminated and suit was filed after the parties could not agree upon profit distribution and expense reimbursement. A bench trial was held 5 January 2000, and judgment was rendered in favor of the plaintiffs on 21 June 2000 against Mr. Good and CIC.[3]
In its reasons for judgment, the trial court recognized that the first issue to be decided was the capacity in which the parties had entered into the joint venture. [4 After considering the evidence, and specifically finding the testimony of Mr. Areement to be the most credible, the court held that the plaintiffs proved that a joint venture existed between ABRI and Dennis Good, doing business as Chandeleur Islander. Further, the court stated:
If Dennis Good intended to later change the agreement with Arcement to contract not individually, but through corporate entities, that should have been clearly communicated. It is clear that Arcement dealt only with Dennis Good in forming the venture. It is also clear that the initial agreement was with a non-corporate entity specifically Chan-deleur Islander through Dennis Good; Arcement could reasonably rely upon that agreement continuing forward into the joint venture absent any showing by defendants that it [sic] intended to change and Arcement agreed to this change. Accordingly, the joint venture continued with Arcement Boat Rentals, Inc. dealing with Dennis Good individually doing business as Chandeleur Islander.
The issues of the profit determination and expense reimbursement were not as clear to the trial court. After initially rendering judgment in plaintiffs’ favor for the total amount of $31,468.82,[4] a motion for new trial was filed and granted solely to reconsider the proper method of calculation of revenue, profits, and reimbursements. The trial court issued a new judgment and reasons on 21 January 2001, awarding the amended sum of $28,909.99.[5] It is from this judgment that the defendants have appealed.
The defendants have assigned two errors for consideration. First, they contend *618 that the trial court erred in finding that the joint venture existed between GABRI and Dennis Good d/b/a Chandeleur Islander, and not between ABRI and CIC. Second, the defendants argue that the trial court erred by awarding $14,803.39 for unreimbursed expenses due ABRI. Instead, the defendants contend that the total amount of expenses due ABRI is $5,868.93, a difference of $8,934.46.
Our standard of review is manifest error-clearly wrong, whereby we give great deference to the trier of fact’s findings and determinations of credibility. Lasyone v. Kansas City Southern R. R., 2000-2628 (La.4/3/01), 786 So.2d 682.
The defendants argue that the trial court erred in finding that Mr. Arcement contracted with Mr. Good and not CIC. However, while this Court may have come to a contrary conclusion, we cannot say that the lower court was clearly wrong in making this finding. The trial court heard all the testimony, especially that of Mr. Arcement and Mr. Good, which conflicted in almost every respect. We note that the record reflects that Mr. Good was extremely evasive while testifying during the plaintiffs’ case in chief. Certainly, his unwillingness or inability to be more forthright likely affected the trial court’s impression of his truthfulness. The court was charged with determining the credibility of the witnesses and was entitled to believe Mr. Arcement over Mr. Good. Although documents introduced demonstrate that CIC was involved in the joint venture sometime after its formation, nothing but the testimony of the parties exists to consider as to the formation of the venture itself.
In addition to evaluating the testimony, the trial court relied upon the original documents used to begin the venture and Mr. Arcement’s rejection of the draft written agreement presented after the venture was in operation to be the most | (¡significant. This, the trial court stated, demonstrated the intent of both parties forming the venture and once it began.
It is well settled that while what constitutes a joint venture is a question of law, the existence or nonexistence of a joint venture is a question of fact. Grand Isle Campsites, Inc. v. Cheek, 262 La. 5, 262 So.2d 350 (1972). “[Jjoint adventures [sic] arise only where the parties intended the relationship to exist. They are ultimately predicated upon contract either express or implied.” Pillsbury Mills, Inc. v. Chehardy, 231 La. 111, 124, 90 So.2d 797, 801 (1956), citing Daspit v. Sinclair Refining Co., 199 La. 441, 6 So.2d 341 (1942).
In Daily States Pub. Co. v. Uhalt, 169 La. 893, 126 So. 228 (1930), the Supreme Court of Louisiana defined a joint venture as follows:
[A]special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.
Id. at 231.
In order to form a valid joint venture in Louisiana, the following elements are required:
(A) All parties must consent to formation of a partnership;
(B) There must be a sharing of losses of the venture as well as the profits; and
(C) Each party must have some proprietary interest in, and be allowed to exercise some right of control over, the business. (Citations omitted.)
Marine Services, Inc. v. A-1 Industries, Inc., 355 So.2d 625, 628 (La.App. 4 Cir. 1978).
We agree with the trial court and find that a joint venture came into existence on 10 May 1994 and terminated on *619 17 July 1994. We also find ample |7evidence in the record to support the trial court’s determination that the venture existed between ABRI and Mr. Good, individually, and not CIC.[6] This evidence, as identified by the trial court, consists of Plaintiff Exhibits 20 and 21, in which Mr. Good held himself out to third par-ties as Dennis Good, president of Chandeleur Islander Resort.[7] These documents were generated after CIC was incorporated on 14 April 1994.
The trial court also found no subsequent assignment of Mr. Good’s interest in the joint venture to CIC to which assignment Mr. Arcement agreed. Pursuant to La. C.C. art.1900, Mr. Arcement’s consent is not required for an assignment to take place. However, because no evidence was introduced to prove that Mr. Arcement was placed on notice of an assignment, we agree with the trial court’s conclusion that the joint venture was entered into by, and remained between, ABRI and Mr. Good.[8] Accordingly, this assignment is without merit.
We next turn to the issue of damages. The defendants concede that the majority of damages awarded by the trial court was “a judgment call which is unlikely to be overturned on appeal.” However, the defendants take issue with the expenses claimed by ABRI for reimbursement to Dana Arcement, Mr. Arcement’s wife, and Gerald Arcement, Mr. Arcement’s father, and further argue that the trial court failed to reduce the total expenses by one-third.[9]
|sThe defendants maintain that nothing in the record supports the “self-serving” testimony of Gerald Arcement and Dana Arcement that they were entitled to wages for services purportedly rendered to the joint venture. However, Mr. Arcement testified that he had a specific agreement with Mr. Good to hire his wife, Dana, and his father, Gerald. Although Mr. Good disputes Mr. Arcement’s testimony, the trial court again made a credibility determination that is not clearly wrong. Therefore, this assignment is without merit.
Finally, we find no merit to the defendant’s argument that the trial court failed to reduce the reimbursement expenses by one-third, which represents ABRI’s share of the expenses. This argument is based on a misunderstanding of the accounting concept of net profits. Net profits means “[p]rofits after deduction of all expenses.” Black’s Law Dictionary 939 (5th ed.1979)(emphasis added). The trial court properly applied that accounting concept and did not miscalculate the reimbursement expenses owned. Adopting Mr. Good’s argument, in essence, results in applying the one-third reduction twice— first in the fictitious calculation of gross profits and second in the calculation of actual expenses owed.
However, in reviewing the record, we discovered a mathematical error in the trial court’s calculation of reimbursement *620 expenses.[10] Therefore, the net profit of | b$6,006.60 is reduced to $5,939.37.' Therefore, the award to ABRI is as follows:
Net profit: $ 5,939.37
Reimbursements: 14,803.39
Lost profit for complimentary guests: 2,600.00
Repayment of check: 5,500.00
TOTAL: $28,842.76
In all other respects, the judgment of the trial court is affirmed.
Accordingly, we amend the judgment of the trial court and affirm as amended. The defendant shall bear all costs of the appeal.
JUDGMENT AMENDED; AFFIRMED AS AMENDED.

. The Chandeleur Islander is a houseboat owned by Blue Goose Charters, Inc. ("Blue Goose"), and operated by Good Streak Marine, Inc. ("Good Streak”), from 1992 through April 1994. Mr. Good, who owned fifty percent of Blue Goose, was in the process of buying out the other fifty-percent owner of the corporation. Mr. Good was also president of Good Streak, which had chartered the Chandeleur Islander from Blue Goose.

. Mr. Good maintains that he was always acting on CIC's behalf and was a messenger between Messrs. Quantz and Arcement "giving then advice as to how to structure the deal.”

. The trial court dismissed plaintiffs’ claims against Good Streak. That part of the judgment is final because no party appealed that part of the judgment.

. The award is broken down as follows: $11,164.93 in undistributed profits; $5,500.00 for a check on which stopped payment was ordered; and $14,803.39 in unpaid reimbursements.

.The award is broken down as follows: $6,006.60 in undistributed profits; $5,500.00 for a check on which stopped payment was ordered; $2,600.00 for lost profits on excess complimentary guests; and $14,803.39 in unpaid reimbursements.

. In fact, Mr. Good testified that when he began talking with Mr. Arcement in April 1994, he did not know for whom he was acting.

. The record does not disclose that either CIC or Mr. Good ever recorded a trade name affidavit or assumed business affidavit in accordance with La. R.S. 51:211 et seq. or La. R.S. 51:281 et seq.

. Finally, Mr. Good argues that he was acting on behalf of CIC when negotiating with Mr. Arcement and thereafter, however, no evidence exists in the record to support this allegation.

. When the venture was formed, ABRI agreed that it would receive one-third of the profits and pay one-third of the expenses.

. When reviewing the trial court’s calculations, we discovered that the court arrived at a total of $78,565.19 as reimbursement expenses, but the figures used by the court actually total $78,766.90. Therefore, the net profit amount is reduced accordingly.