hGREMILLION, Judge.
This is an appeal by the plaintiff, John-co, Inc., from the trial judge’s decision in favor of the defendants, Jameson Interests, Peter K. Jameson, and Thomas G. Jameson. For the reasons set forth below, we affirm.
FACTS
This case involves litigation between Johnco, Inc., a Texas corporation whose sole shareholder is Andrew Jameson, and Jameson Interests, a Texas partnership consisting of brothers Peter and Thomas Jameson. The parties to this suit are the grandchildren of John B. Jameson, Sr. He owned approximately 17,320 acres in Rap-ides, Evangeline, and Vernon Parishes. When he died, this property passed to his three children, John B. Jameson, Jr., Robert D. Jameson, and Jane Jameson Lord, who became owners of undivided equal shares. The principal players in this suit are the children of Robert (Robert, Jr., Thomas, and Peter) and John, Jr., (Andrew). In |21985, the three branches of the family divided the surface area of the property with each receiving acreage of equal value, but they continued to own the minerals in indivisión.
In 1986, Thomas Jameson met R.W. Boebel, a geologist. Thomas asked Boebel to evaluate some seismic data the three branches had acquired to see if development of the minerals was a worthwhile cause. After an analysis of the data, he reported that the “present economics” did not support development. However, in 1991, Boebel contacted Thomas to once again review the seismic data because recent developments in the production of shallow gas might make the project viable. Boebel secured the help of Luis J. Batista, a New Orleans geophysicist, who specialized in shallow gas development.
After Boebel and Batista determined that development was possible, they entered into an agreement with Jameson Interests (Peter, Thomas, and Robert) for the development of the 17,320 acres.[1] Under the agreement, Boebel and Batista would split with Jameson Interests one-half of any overriding royalties they received from the lease exceeding two percent. Additionally, Jameson Interests would receive one-half of any monies in excess of $50,000.00 received by Boebel and Batista for finder’s fees, consulting fees, or for any payment related to the lease.
In 1992, Boebel and Batista reached a tentative agreement with Bridwell Oil Company for the development of the 17,-320 acres. Under this agreement, Boebel and Batista would receive a five percent overriding royalty interest, Bridwell would receive a seventy-five percent revenue interest, and the remaining twenty percent would be paid to the mineral owners. Bridwell made it known that it desired to lease |3the mineral rights to the entire 17,320 acres. However, the Lords decided not to pursue the development of their undivided interest in the minerals.
On January 11, 1994, Peter wrote to Andrew and proposed a partition of the minerals owned by the three families, followed by a reuniting of the mineral rights of Jameson Interests and Johnco. In March, Johnco, Jameson Interests, and the Lords partitioned the mineral rights of the property. On March 29, Johnco and Jameson Interests combined their mineral rights in proportions of an undivided 53.9663% to Jameson Interests and an undivided 46.0337% to Johnco. On April 4, 1994, Bridwell leased the minerals of Jameson Interests, and on April 5, 1994, *869 Bridwell leased the minerals of Johnco. Soon afterwards, Boebel assigned an overriding royalty interest to Jameson Interests pursuant to the January 11, 1994 agreement. Andrew learned of the assignment because of the recordation of the assignment, and on November 13, 1995, Johnco filed suit against Jameson Interests, Peter, and Thomas, seeking an accounting of all profits from the January 11, 1994 agreement. In a supplemental and amending petition, Johnco named Batista as a defendant.
Johnco proceeded to trial under several theories. It alleged that the combined efforts of Johnco, Jameson Interests, Boe-bel, and Batista constituted a joint venture and that the secret dealings between Jameson Interests and Boebel and Batista were a violation of the fiduciary duty owed to one another as joint venturers. In the alternative, Johnco claimed that by their actions, Jameson Interests, Boebel, and Batista were bound to the duties as agents under the doctrine of negotiorum gestio. In a supplemental and amending petition, Johnco further asserted that the secret dealings constituted a charge, claim, or encumbrance on the minerals and the 1¿failure to disclose this deal was an intentional act of concealment and, therefore, a breach of warranty. In the alternative, it also alleged that Jameson Interests were hable under the doctrine of unjust enrichment.
Prior to trial, Batista’s exception of no cause of action was sustained, and Boebel was dismissed via motion for summary judgment. A trial on the merits was held on March 10, 1998, and the judgment was signed on September 11, 1998. In this judgment, the trial court made the following findings:
1. There did not exist an explicit or implicit agreement producing a legal relationship between Johnco, Inc., and the Jameson Interests which would have created a joint venture.
2. The doctrine of negotiorum gestio was inapplicable because the Jame-son Interests did not undertake to manage or protect the interests of Johnco, Inc.
3. The breach of warranty claim was inapplicable because the agreement was between the Jameson Interests and Boebel and Batista.
4. The agreement between the Jame-son Interests and Boebel and Batista did not constitute an unjust enrichment because Johnco, Inc. was not impoverished by the agreement; it received its ten percent royalty as did the Jameson Interests.
Johnco, Inc., appeals and raises five issues on appeal.
STANDARD OF REVIEW
“The ultimate determination with regard to the existence or nonexistence of an obligation and/or contract ... [is a question] of fact for the jury which should not be disturbed in the absence of clear or manifest error.” Roddy v. Crawford, 618 So.2d 1229, 1237 (La.App. 3 Cir.1993). In Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973), the supreme court commented on the deference afforded factual | .¡findings:
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
NEGOTIORUM GESTIO
The first issue raised by Johnco is whether the activities of Peter and Thomas Jameson in pursuing the development of minerals owned in indivisión with Johnco, give rise to application of the doctrine of negotiorum gestio, and if so, whether Peter and Thomas Jameson breached the fiduciary duty that exists between the de *870 facto agent and principal under that doctrine.
Negotiorum gestio occurs “when a person ... acts without authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances.” La.Civ.Code art. 2292. “It is essential to negotiorum gestio that the manager be doing another’s business, not his own business.” Burns v. Sabine River Auth., 614 So.2d 1337, 1340 (La.App. 3 Cir.), writ denied, 617 So.2d 935 (La. 1993). The comments to Article 2292 provide guidance when determining whether the acts bring about a negotiorum gestio:
(b) This Article accords with Article 2295 of the Louisiana Civil Code of 1870. The affair managed may be a material act, such as the protection of property from fire or flood, or the execution of a juridical act, such as the sale of perishable things.
(c) According to French doctrine and jurisprudence that is pertinent for Louisiana, the Civil Code provisions governing the management of affairs apply when there is a necessity or when the owner derives some benefit from the acts of the manager. See 7 Ripert et Planiol, Traité pratique de droit civil frangais 8 (2d ed. Esmein 1954). In Kirkpatrick v. Young, 456 So.2d 622 (La. 1984), the Louisiana ^Supreme Court declared that a person does not qualify as negotiorum gestor unless he undertakes the management with the “benefit” of the owner in mind.
(d) This Article does not apply when the person who undertakes management acts in his own interest or contrary to the actual or presumed intention of the owner. In such a case, there is a usurpation, and the person who manages an affair under these circumstances may incur liability under the law of delictual obligations.
The evidence and testimony clearly show that Jameson Interests was acting to advance their own interests and not seeking to protect the interest of Johnco. From the beginning, Jameson Interests was seeking to develop their minerals, and there was no evidence that it was acting without authority to protect Johnco’s interests. Therefore, we find that the trial court was correct in finding that the doctrine of negotiorum gestio was inapplicable to this case.
CO-OWNERS — FIDUCIARY DUTY
The second issue raised by Johnco is whether it was a co-owner along with the Jameson Interests of the minerals, and if so, whether Jameson Interests breached its fiduciary duty owed as a co-owner.
The trial court found that Johnco and Jameson Interests were not co-owners of the minerals. The March 29, 1994 transfer of mineral interests provided the trial court with a reasonable basis on which it could have found that Johnco and Jameson Interests were, in fact, not co-owners. In 1985, the Lords, Johnco and Jameson Interests divided the surface of the property but continued to own the minerals in indi-visión. In 1994, when the Lords expressed their desire not to pursue the development of the minerals, the three groups acquired full ownership of the minerals lying under the property owned by each group. Subsequently, Johnco and Jameson Interests combined their mineral ownerships and then conferred a pro rata |7share of an undivided 53.9663% interest on Jameson Interests and an undivided 46.0337% interest on Johnco. Under this agreement, what Jameson Interests acquired was not a right to a 53.9663% share of the minerals, but the right to 53.9663% of the minerals. Conversely, Johnco gained the right to 46.0337% of the minerals. See Clark v. Tensas Delta Land Co., 172 La. 913, 136 So. 1 (1931). As such, the trial court was not clearly wrong or manifestly erroneous in finding that co-ownership did not exist. Therefore, we find no merit in this assignment of error.
*871 JOINT VENTURERS
The next issue raised by Johnco, is whether the relationship between the parties constituted a joint venture, and if so, whether Jameson Interests violated its fiduciary duty with the secret agreement.
In Latiolais v. BFI of Louisiana, Inc., 567 So.2d 1159, 1161-62, (La.App. 3 Cir. 1990), the court defined joint venture:
It is well settled that while what constitutes a joint venture is a question of law, the existence or nonexistence of a joint venture is a question of fact. Grand Isle Campsites, Inc. v. Cheek, 262 La. 5, 262 So.2d 350 (1972); Cajun Electric Power Cooperative, Inc. v. McNamara, [452 So.2d 212 (La.App. 1 Cir.), writ denied, 458 So.2d 123 (La.1984) ].
“As a general rule, in order to constitute a joint venture it is necessary that the parties agree to share losses, and an important test in determining whether or not a joint venture exists is whether or not there is an agreement to share in losses. The term losses’ for purposes of the general rule is not limited to monetary losses, but includes time expenditures and out of pocket expenses, especially where one party to the venture furnishes property and the other only services.
The absence of an express agreement to share in losses is not conclusive as to the nature of the relationship, since such an agreement may be implied from an agreement to share profits. Moreover, it has been held not |sto be essential that the parties agree, expressly or impliedly, to share the losses, and when the nature of the undertaking is such that no losses other than time and labor in carrying out the undertaking are likely to occur, the agreement of the parties to divide profits may be sufficient to stamp the undertaking a joint venture.” 48A C.J.S. Joint Ventures § 13. (Emphasis ours)
In Guilbeaux v. Times of Acadiana, Inc., 96-360, p. 10 (La.App. 3 Cir. 3/26/97); 693 So.2d 1183, 1188, writ denied, 97-1840 (La.10/17/97); 701 So.2d 1327, we stated:
Since the essential elements of a joint venture and a partnership are the same, joint ventures are generally governed by partnership law. Latiolais v. BFI of Louisiana, Inc., 567 So.2d 1159 (La.App. 3 Cir.1990). Louisiana Civil Code Article 2801 defines partnership as:
[A] juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit.
A joint venture requires:
(1) A contract between two or more persons;
(2) A juridical entity or person is established;
(3) Contribution by all parties of either efforts or resources;
(4) The contribution must be in determinate proportions;
(5) There must be joint effort;
(6) There must be a mutual risk vis-a-vis losses;
(7) There must be a sharing of profits.
“[J]oint adventures arise only where the parties intended the relationship to exist. They are ultimately predicated upon contract either express or implied.” Pillsbury Mills, Inc. v. Chehardy, 231 La. 111, 124, 90 So.2d 797, 801 (1956) (citing Daspit v. Sinclair Refining Co., 199 La. 441, 6 So.2d 341 (1942)).
|flThe trial court determined that no specific or implied contractual relationship existed between Jameson Interests and Johnco. After a review of the record, we find no evidence suggesting that the trial court committed manifest error concerning the intent of the parties. Therefore, we find no merit in this assignment of error.
*872 BREACH OF WARRANTY
Johnco further asserts that the trial court erred in finding that the secret December 16, 1991 agreement was not an encumbrance. Johnco cites American Legion, Ed. Brauner Post No. 307, Inc. v. Southwest Title & Insurance Company, 207 So.2d 393 (La.App. 4 Cir.1968), annulled on other grounds, 253 La. 608, 218 So.2d 612 (1969), to support its contention that the agreement was an encumbrance. The court in American Legion defined encumbrance as follows:
Black’s Law Dictionary, Fourth Edition, defines incumbrance (encumbrance) to be “any right to, or interest in, land which may subsist in another to the diminution of its value, but consistent with the passing of the fee. * * * A claim, lien, charge or liability attached to and binding real property.” Webster’s New International Dictionary, Second Edition, defines encumbrance: “Law. A burden or charge upon property; a claim or lien upon an estate which may diminish its value; specifically any interest or right in land existing to the diminution of the value of the fee, but not preventing the passage of the fee by conveyance.”
Id. at 400. Johnco asserts that this definition would include the agreement for the overriding royalty on the minerals because the agreement diminished the value of the minerals. We disagree with Johnco’s assertion that the overriding royalty agreement diminished the value of the minerals. Clearly, this agreement did not constitute a claim, lien, charge or liability attached to the real property because the proceeds received by Jameson Interest came from Boebel and Batista’s interest from their [mcontract with Bridwell. Neither Johnco nor Jameson Interests were privy to that agreement. Therefore, we dismiss this assignment of error.
UNJUST ENRICHMENT
In the final issue raised, Johnco asserts that the trial court erred in finding that the doctrine of unjust enrichment was inapplicable.
A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term “without cause” is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.
La. Civ. Code art. 2298. Comment (b) to this Article explains the requirement of an enrichment and impoverishment:
(b) A person is enriched within the meaning of this Article when his patrimonial assets increase or his liabilities diminish. Correspondingly, a person is impoverished when his patrimonial assets diminish or his liabilities increase. There must be a causal connection, whether direct or indirect, between a person’s enrichment and another person’s impoverishment.
In Carriere v. Bank of Louisiana, 95-3058, p. 17 (La.12/13/96); 702 So.2d 648, 671, the Louisiana Supreme Court provided the five requirements for showing an unjust enrichment:
[Tjhis court held on several occasions that the five requirements for a showing of unjust enrichment or action de in rem verso are: (1) there must be an enrichment; (2) there must be an impoverishment; (3) there must be a connection between the enrichment and the resulting impoverishment; (4) there must be an absence of “justification” or “cause” for the enrichment and impoverishment; and (5) there must be no other remedy at law available to plaintiff.
Johnco rightly asserts that the kickback of finders fees and commissions received by Jameson Interests represents an enrichment. Further, Johnco alleges that this enrichment constitutes an impoverishment to it because this payment is an *873 [^overriding royalty interest from the production of the minerals it owns. However, we note that in this contract, Boebel and Batista assigned a portion of their fees to Jameson Interests. As owners of the minerals, both Johnco and Jameson Interests received a twenty percent royalty interest to be divided in proportion to each party’s undivided interest. Therefore, we cannot agree with Johnco’s assertion that it was impoverished from this deal, and, as such, we dismiss this assignment of error.
CONCLUSION
The judgment of the trial court is affirmed. All costs of this appeal are assessed to the plaintiff-appellant, Johnco, Inc.
AFFIRMED.
AMY, J., CONCURS AND ASSIGNS REASONS.
PETERS, J., DISSENTS AND ASSIGNS REASONS.

. Robert Jameson, Jr., would later withdraw from this deal.